# EXHIBIT D

## GENERAL ALLEGATIONS

**A. Metrc's Business.**

1.  Metrc is a software-as-a-service ("SaaS") provider which contracts with state regulatory agencies overseeing legalized cannabis programs to provide a cannabis tracking system ("CTS") utilized by the state agency and participants in the programs to track cannabis from growth, harvest, and processing to testing, transport, and sale. The CTS system generally relies upon the use of radio-frequency identification ("RFID") tags, which licensees must purchase from Metrc. Metrc also offers SaaS products directly to licensees, which integrate with the CTS system.

2.  Metrc holds contracts with the state regulatory agencies of Oregon, California, and at least twenty other states, as well as with the District of Columbia and Guam, and is by far the largest provider of CTS solutions to state agencies. Upon information and belief, Metrc does not hold a contract with the State of Florida.

3.  In every state that regulates the production and sale of marijuana, use of a CTS such as the one provided by Metrc is mandated under state law. The purpose of this legal requirement is to prevent cannabis products produced outside of the regulated system from entering the regulated market (inversion), and also to prevent cannabis products produced inside the regulated system from being sold outside of the regulated market (diversion).

4.  In reality, Metrc does little to prevent diversion. There are numerous loopholes in Metrc's CTS that allow cannabis licensees to circumvent the claimed safeguards in order to divert cannabis products while appearing compliant.

5.  Additionally, as described in more detail below, the staggering quantity of data that is collected by Metrc is provided to state regulatory agencies in a manner which makes

detecting diversion like finding a needle in a haystack. This has allowed (and some would argue facilitated) rampant diversion, especially in traditional producer states such as Oregon and California.

    **B.  Metrc Acquires Chroma Signet and Hires Counter-Plaintiff.**

    6.    Counter-Plaintiff founded Chroma Signet in 2013. Chroma Signet was a company engaged in developing an NFT-enabled QR platform that provided protection from counterfeiting and rewarded customers for their loyalty and data by connecting physical objects (for example, a bag of coffee) to digital assets (in the example of a bag of coffee, the digital assets might be all of the details of the coffee's production, any testing, and other supply chain data).

    7.    On April 7, 2023, Metrc, through its subsidiary MCS Acquisition, LLC (now named Metrc ID, LLC), acquired Chroma Signet via an asset purchase agreement.

    8.    As part of its acquisition of Chroma Signet, Metrc hired Counter-Plaintiff as an Executive Vice President at a salary of $175,000 per year, plus participation in an incentive 25% annual cash bonus plan, and a $100,000 signing bonus, repayable to Metrc if Counter-Plaintiff's employment terminated for any reason prior to the second-year anniversary of his start date.

    **C.  Counter-Plaintiff is First Exposed to Metrc's Ethically Questionable Business Practices.**

    9.    When Metrc acquired Chroma Signet, Metrc mailed Counter-Plaintiff a glass trophy fabricated to honor the transaction. The trophy has a Chroma Signet logo and a Metrc log, and memorializes the acquisition.

    10.    Counter-Plaintiff took a photo of the trophy and posted it to LinkedIn, where the post quickly gathered dozens of positive reactions and comments.

11. However, Michael Johnson, CEO of Metrc, quickly texted Counter-Plaintiff, and the following exchange took place between Counter-Plaintiff and Johnson:



12. Startled and confused that Johnson was openly admitting to surreptitiously breaching provisions of contracts Metrc held with state regulatory agencies, Counter-Plaintiff sought guidance from Johnson about how and when to disclose the acquisition.

Page 3

Exhibit D

13. When Counter-Plaintiff and Johnson had a follow up conversation later, Johnson told Counter-Plaintiff that he was aware that some of Metrc's state contracts forbid Metrc from selling to marijuana licensees. Forming MCS Acquisition, LLC to acquire Chroma Signet allowed Metrc to conceal the acquisition.

14. When Counter-Plaintiff asked Johnson how and when he could disclose the acquisition, Johnson initially suggested that they could preserve the Chroma Signet brand in the marketplace and Counter-Plaintiff could pretend that it was still a startup and that Counter-Plaintiff was still CEO, while secretly being fully employed by Metrc. Counter-Plaintiff was unwilling to lie about the acquisition, so rebuffed Johnson's suggestion.

**D. Counter-Plaintiff Visits Catalyst Cannabis Company and Learns of Metrc's Role in Enabling Diversion.**

15. On June 8, 2023, Counter-Plaintiff and a colleague took a Metrc-sponsored business trip to a company in California called HNHPC, Inc. dba Catalyst Cannabis Company ("Catalyst") for the purpose of marketing Metrc's products to Catalyst, and met with Catalyst's owner, Elliott Lewis.

16. At the meeting, Mr. Lewis took the opportunity to explain, in detail, how companies in California divert vast quantities of marijuana from California's legal market to illicit markets in other states.

17. According to Mr. Lewis, criminals use straw purchasers to obtain marijuana distribution licenses under California law. These licensees, which use Metrc as their state-mandated inventory tracking system, then purchase bulk quantities of marijuana on the legal market, and sell the product in the illicit market, most often in other states.

18. These operations are commonly referred to as "burner distros" (a reference to "burner" cell phones used by criminals and then thrown away). In a complaint filed by Catalyst against the California Department of Cannabis Control (the "DCC"), which accuses the DCC of turning a blind eye to the burner distro phenomenon (to the dismay of lawful operators), the burner distro scheme is described as follows:

> 4. … Operators (usually legal cannabis operators) purchase or obtain distribution licenses in various local jurisdictions, often where cultivation operations are prevalent and/or where such licenses are relatively easy and/or cheap to obtain or acquire. Often, an operator will procure multiple local licenses by using an array of different "front men" who agree to attach their names to the licenses (which is significant, as the State's lack of enforcement has made acting as a straw man for a Burner Distro an incredibly high yield, low risk endeavor). Once licensed, the Burner Distros then purchase large quantities of cannabis from cultivators within the State. In connection with those purchases, the Burner Distros (which by law are responsible for collecting and paying all legally mandated cultivation and excise taxes) may or may not pay the "cultivation tax" to the State (via payment to the California Department of Tax and Fee Administration ("CDTFA")).
>
> 5. Once the cannabis reaches the Burner Distros, however, the DCC effectively ceases regulating or even monitoring what happens to that cannabis, and instead relies heavily if not exclusively on tips or complaints to instigate investigations or enforcement proceedings against illegal operators. As a result, Burner Distros evade payment of the 15% excise tax (which in practice amounts to a 27% tax levied on the wholesale price based on the State's required "markup" rate) owed by distributors when the cannabis products are delivered to retail dispensaries or and/or (to a lesser extent) even when they illegally ship the cannabis out of state. As of the date of this Petition, HNHPC is informed and believes the amount of excise taxes evaded by Burner Distros total hundreds of millions of dollars per year on billions of dollars' worth of cannabis and cannabis products, while legitimate distributors are forced to pay the excise tax. The cost savings achieved by Burner Distros through the evasion of the excise taxes alone allows illegal dispensaries and other unregulated markets to purchase largely if not entirely unregulated cannabis from the Burner Distros at a steep discount, which they in turn sell at prices far lower than legal dispensaries can sell comparable regulated cannabis products obtained from legitimate distributors who in fact pay all such taxes. In essence, the DCC by its inaction has significantly bolstered the illegal black market in California and encouraged the illegal export of cannabis across state lines.

*HNHPC, Inc. v. Dept. of Cannabis Control, et al.,* Case No. 30-2021-012210114-CU-WM-CJC, Verified Petition for Writ of Mandamus and Complaint for Peremptory Writ of Mandate; and Injunctive Relief, filed September 15, 2021, at ¶ 4-5.

19. Circumstantial evidence of the diversion of state-legal marijuana products from California to other states is easy to come by and reported on often. *See, e.g.,* "Exclusive: Does Stiiizy have a diiiversion problem?" at https://www.weedweek.com/stories/exclusive-does-stiiizy-have-a-diiiversiiion-problem/ and "SCOOP: Glass House products spotted in NYC raid" at https://www.weedweek.com/stories/scoop-glass-house-products-spotted-in-nyc-raid/.

20. Because of the way the "burner distro" scheme is structured, distributors who engage in these illicit actions are easily identifiable via a review of their CTS data, which is available to Metrc in real time.

21. At his meeting with Counter-Plaintiff, Mr. Lewis further alleged that one of the largest marijuana growers in California, Glass House, was complicit in these practices, and that he suspected that fully 75% of Glass House's revenue was attributable to sales through burner distros.

22. Counter-Plaintiff was greatly troubled by Mr. Lewis' allegations, which seemed credible to Counter-Plaintiff. Moreover, Counter-Plaintiff knew that even though cannabis licensees such as Catalyst might complain about the DCC "ceas[ing] regulating or even monitoring" the cannabis once it reaches a "burner distro," the DCC can only do so much with the tools it has, and if the Metrc CTS does not alert the DCC to instances of possible diversion, it follows that all the DCC would be able to do is "rel[y] heavily if not exclusively on tips or complaints to instigate investigations or enforcement proceedings against illegal operators," as alleged by Catalyst.

23. Because of Counter-Plaintiff's familiarity with Metrc's CTS system, Counter-Plaintiff also knew that Metrc could easily verify whether Mr. Lewis' allegations had substance,

and that such verification would take no more than a matter of minutes. Counter-Plaintiff verified this realization with other Metrc employees.

24. Counter-Plaintiff realized that Metrc, a state-mandated tracking system, was essentially providing cover for these illegal "burner distro" activities by turning a blind eye to the data and failing to alert law enforcement. This seemed to Counter-Plaintiff like either a gross dereliction of Metrc's appointed role, a violation of law, or corruption on the part of Metrc.

25. As set forth above, if the overriding purpose behind requiring a "seed-to-sale" CTS for cannabis licensees is to prevent diversion, surely such CTS should alert authorities when data suggesting diversion is detected. Counter-Plaintiff knew that enabling such alerts would be a trivial exercise, and was surprised to learn that no such alerts exist.

26. To put it plainly, even though Metrc has been contracted by the State of California for the express purpose of preventing the diversion of marijuana to the illicit market, Metrc's CTS platform does not flag suspicious occurrences, such as when a new distributor purchases large quantities of cannabis products which are never transferred to a retail licensee. While the state regulatory agencies which contract with Metrc are certainly able to determine the disposition of a particular cannabis product, the agencies would have to search for data related to *that specific product,* and are not alerted when something suspicious occurs with respect to that product. In other words, Metrc's CTS certainly provides evidence of diversion, but only if you already know what you are looking for.

27. Counter-Plaintiff also realized that Metrc had a perverse incentive to ignore data suggesting diversion via burner distros, because reporting the data to law enforcement would make it clear that California's state-mandated marijuana tracking system does little to prevent diversion to the illicit market. Reporting this information to law enforcement might lead to the

cancellation of multiple state contracts, serious or fatal damage to Metrc's business model, and/or claims against Metrc for damages for falsely representing the capabilities of its software to the State of California for the purpose of obtaining money from the State.

28. Additionally, Counter-Plaintiff realized that Metrc's business model is increasingly geared toward supply chain management rather than preventing diversion. In fact, a substantial amount of Metrc's revenue is derived from sales of their products to industry participants, rather than their contracts with state regulatory agencies. If Metrc's product actually prevented diversion, it might face an industry backlash and be thrust from its privileged position.

29. Added to Counter-Plaintiff's knowledge that Metrc sought to hide its acquisition of Chroma Signet from its regulatory agency customers as well as its intent to do prohibited business with licensees, and that such acquisition likely violated Metrc's contracts with some of those customers, after reflection, Counter-Plaintiff concluded that Metrc had either made false claims and certifications to the State of California, and presumably other states, about the capabilities of its marijuana tracking system, or that it was knowingly complicit in enabling the illegal sales. Or perhaps both.

30. Either way, Counter-Plaintiff developed the good faith belief that Metrc was violating a number of laws, including, but not limited to, California's False Claims Act, and Cal. Bus. & Prof. Code § 26067(b)(2) (establishing the requirement that the DCC establish a track and trace program for cannabis and specifying that "[t]he database shall be designed to flag irregularities for the department to investigate.").

E. **Counter-Plaintiff Reports His Concerns to His Supervisor and is Later Terminated.**

31. On June 12, 2023, Counter-Plaintiff met with his supervisor James Daley (Head of Product at Metrc) and explained his concerns. Specifically, Counter-Plaintiff told Mr. Daley in

Page 8

Exhibit D

great detail the nature of his conversation with Mr. Lewis, and outlined the accusations methodically. In other words, Counter-Plaintiff reported to Mr. Daley information that he in good faith believed was evidence that Metrc was violating California and federal law, and enabling others to violate California and federal law.

32. Mr. Daley instructed Counter-Plaintiff not to mention the matter to anyone else, at the company or otherwise.

33. Counter-Plaintiff was shocked by this dismissive outcome, which only reinforced his suspicions about Metrc's complicity.

34. On June 14, 2023, Counter-Plaintiff shared an article[1] from MJBiz Daily, published June 13, 2023, about a lawsuit Catalyst filed against Glass House, on a company Teams chat. Mr. Daley responded, "Marcus Estes you called it."

35. On September 5, 2023, Counter-Plaintiff attended a meeting with Metrc's general counsel, Andrea Kiehl, to discuss Catalyst's allegations. At the meeting, Ms. Kiehl grilled Counter-Plaintiff in an apparent effort to discover everything Counter-Plaintiff had told Catalyst about Metrc's capabilities with respect to the burner distro situation. At the conclusion of the meeting, Ms. Kiehl instructed Counter-Plaintiff not to talk to anyone about anything related to the "burner distro" allegations. Counter-Plaintiff left the meeting with the distinct impression that Metrc was attempting a cover up.

36. After the meeting with Metrc's general counsel, Metrc began to freeze Counter-Plaintiff out of important facets of his previous employment duties and responsibilities.

37. For example, Metrc excluded Counter-Plaintiff from important meetings regarding Retail ID, and Metrc asked Counter-Plaintiff not to attend MJBizCon, an important

---

[1] https://mjbizdaily.com/catalyst-cannabis-lawsuit-accuses-glass-house-brands-of-illicit-activity/

Page 9

Exhibit D

cannabis industry event in Las Vegas, where Metrc intended to launch the Retail ID product. Any attempt Counter-Plaintiff made to gain more involvement in the product was rebuffed, including recommendation of key hires and general management of the product. From these and other interactions with Metrc management, Counter-Plaintiff formed a definite feeling of being unliked and shunned within the company.

38. Counter-Plaintiff was otherwise an exemplary employee. In November 2023, Metrc asked Counter-Plaintiff to focus only on sales, and Counter-Plaintiff closed nearly every account he was given, and brought in new business from his own network, including major industry players such as Holistic Industries and Glass House.

39. On March 5, 2024, Metrc initiated Counter-Plaintiff's termination without cause, set to occur on April 18, 2024. The only reason Counter-Plaintiff was given for his termination was that his salary was too high and that nobody was happy with the direction of the Retail ID product line (which was out of Counter-Plaintiff's control, as he had been moved away from directing the product line months earlier).

40. On the same date, Metrc presented Counter-Plaintiff with a Separation Agreement and General Release, which Metrc urged him to sign in exchange for Metrc foregoing its claimed right to be repaid the $100,000 signing bonus. Among other things, the proposed agreement would have released any employment-related claims Counter-Plaintiff may have had against Metrc, as well as any False Claims Act claims, and would have subjected him to a two-year noncompetition and nonsolicitation period. Counter-Plaintiff refused to sign.

41. On April 9, 2024, Metrc terminated Counter-Plaintiff's employment without cause.

## DAMAGES

42. As a direct and proximate cause of Counter-Defendants' actions, Counter-Plaintiff has suffered emotional distress, anguish, humiliation, fear, worry, grief and anxiety, together with a worsening of one or more pre-existing medical conditions, and requests an award of compensatory damages in an amount to be determined by a jury at the time of trial, and not to exceed $2,000,000.

43. As a direct and proximate cause of Counter-Defendants' actions, Counter-Plaintiff has also suffered and continues to suffer loss of earnings, loss of benefits, loss of job opportunities and other employment benefits which continue to accrue in an amount to be determined at the time of trial and no less than $250,000, together with interest and the amount necessary to offset the income tax consequences of the award pursuant to ORS 659A.885(1) and/or as special damages under common law.

44. Counter-Plaintiff also seeks equitable relief including reinstatement to Counter-Plaintiff's former position and a permanent injunction enjoining Counter-Defendants from engaging in any employment practice which discriminates on the basis as alleged in this Complaint.

45. Counter-Plaintiff places Counter-Defendants on notice of Counter-Plaintiff's intent to move the Court to amend this Complaint to seek punitive damages and to seek discovery of all relevant financial documents from Counter-Defendants.

46. Counter-Plaintiff also seeks reasonable attorney's fees and costs in an amount to be proven at trial pursuant to ORS 659A.885(1) and/or ORS 20.107.

## FIRST CLAIM FOR RELIEF

### Whistleblower Retaliation (ORS 659A.199, 659A.885)

47. Counter-Plaintiff realleges paragraphs 1 through 48.

48. In perpetrating the actions described in the above paragraphs, Counter-Defendants subjected Counter-Plaintiff to retaliation for opposing and reporting in good faith information Counter-Plaintiff believed to be evidence of violations of federal and/or state laws, rules, or regulations.

49. Specifically, Counter-Defendants decreased Counter-Plaintiff's job responsibilities and ultimately terminated Counter-Plaintiff in retaliation for Counter-Plaintiff's acts of opposing and reporting information related to Metrc's failure to provide a cannabis tracking system which effectively prevents diversion of marijuana products to the illicit market, and Metrc's false claim to the State of California, and other states, that its CTS system does in fact prevent diversion, flag irregularities, and otherwise operating in accordance with law and the contractual expectations of state regulatory agencies.

50. Counter-Plaintiff requests an award of damages, equitable relief, costs, and attorney fees as alleged in Paragraphs 49 through 53.

## SECOND CLAIM FOR RELIEF

### Unlawful Discharge

51. Counter-Plaintiff realleges paragraphs 1 through 48.

52. At all material times, the public policy of the State of Oregon was to prohibit an employer from interfering with, discriminating and retaliating against employees for opposing and/or making good faith complaints about workplace health and safety violations and what she reasonably believed was unlawful conduct. This public policy is embodied in the common law, statutes, and regulations of the State of Oregon and the United States protecting the public and employees including, but not limited to: ORS 659A.150 *et seq.*; OAR 839-009-0200 *et seq.*; 29 U.S.C. 2601, *et seq.; and Yeager v. Providence Health System Oregon,* 195 Or App 134 (2004).

53. Counter-Plaintiff had a public duty to ensure legal compliance by Counter-Defendants. His job duties required him to monitor and report legal compliance issues, and he has a general public duty to refrain from illegal acts. Therefore, he had a general duty to report illegal acts he was personally directed to complete, and he had a duty that arose from his employment to report legal non-compliance even when he wasn't personally implicated in the wrongful act.

54. Counter-Defendant's decreasing Counter-Plaintiff's job responsibilities and ultimately terminating Counter-Plaintiff was in retaliation for Counter-Plaintiff's pursuit and exercise of Counter-Plaintiff's rights related to Counter-Plaintiff's role as an employee, which rights are of important public interest.

55. Counter-Plaintiff requests an award of damages, equitable relief, costs, and attorney fees as alleged in Paragraphs 49 through 53.

WHEREFORE, Counter-Plaintiff prays for a judgment as follows:

1) A judgment in favor of Counter-Plaintiff declaring he was wrongfully terminated and entitled to an award of economic and non-economic damages as proven at trial;

2) Reinstatement and a permanent injunction enjoining Counter-Defendants from engaging in any employment practice which discriminates on the basis as alleged in this Complaint;

3) Counter-Plaintiff's reasonable attorneys' fees, other fees, costs and expenses of every kind incurred in this action;

4) Prejudgment and post-judgment interest as appropriate and allowed by law;

5)   On all claims, amounts necessary to offset the income tax consequences of receiving a lump sum payment, rather than receiving payment of wages over the time; and

6)   For such other and further relief as the court deems just and proper.